NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0185n.06

Nos. 14-1989/1990

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| HUSSEIN NAZZAL, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

**BEFORE:     SILER, GIBBONS, and ROGERS, Circuit Judges.**

**JULIA SMITH GIBBONS, Circuit Judge.**  Hussein Sam Nazzal (Nazzal) challenges the district court's order of restitution to Z.C. and H.M., a woman formerly employed at one of his restaurants and her son, respectively.  Nazzal pled guilty to conspiracy to defraud the United States for helping arrange several fraudulent marriages, and the government alleges that Nazzal abused Z.C. and H.M. in order to keep them from reporting his illegal activity to the United States.  Because Nazzal forfeited his objection to the district court's and government's treatment of Z.C. and H.M. as victims, we affirm the restitution order.

**I.**

On July 16, 2013, Nazzal pled guilty to one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371.  During the plea colloquy, Nazzal admitted helping to arrange two fraudulent marriages between American citizens and his associates.  The

government and the district court also mentioned Mike "Muhammad" Murry (Murry), with whom Nazzal allegedly arranged another false marriage for Z.C., but Nazzal did not admit these facts as part of his plea.

The Presentence Investigation Report (PSR) mentioned as "offense conduct" the marriage between Murry and Z.C., physical and sexual abuse of Z.C. and H.M. by Nazzal, threats to report them to the immigration authorities, and Z.C.'s work in Nazzal's restaurant without pay. Under the "victim impact" section, the PSR identified Z.C. and H.M. as victims of Nazzal's conduct, again mentioning physical and sexual abuse, Z.C.'s work without pay, and threats that Z.C. would be deported if she did not comply with Nazzal's demands. Nazzal objected to various portions of the PSR, including the offense conduct and victim impact sections that refer to Z.C. and H.M. as victims.

Nazzal stated at the sentencing hearing that he was withdrawing all objections to the PSR "as part of a global agreement" with the government. He characterized this agreement as "resolv[ing] all of the issues that were pending before the Court." At the sentencing hearing, Nazzal did not object to the district court's decision to hold a restitution hearing, and he also did not object to Z.C. and H.M. being called victims and addressing the district court as such. While speaking to the court at sentencing, H.M. told the court that Nazzal kept his and Z.C.'s immigration papers and threatened to deport and otherwise harm them if they ever told anyone about his conduct, while Z.C. testified that he abused and threatened her after she married Murry, saying she owed him money and forcing her to work in his restaurant and have sex with him. Only later, in his response to the government's supplemental sentencing memorandum, did Nazzal object to the characterization of Z.C. and H.M. as victims.

Nazzal, the government, and counsel for Z.C. and H.M. filed with the district court their positions regarding restitution. At the restitution hearing, the government and counsel for H.M. presented testimony and argument regarding Z.C.'s and H.M.'s lost wages and H.M.'s need for long-term psychological treatment, and Nazzal cross-examined the two witnesses. The district court declined to admit a report Dr. Michael Abramsky prepared on Nazzal's behalf or to grant a continuance until Dr. Abramsky was available to testify.

The district court's order granted restitution of $79,107 to Z.C. and $222,399 to H.M. under the Victim Witness Protection Act, finding excessive the amount requested for H.M.'s psychological treatment. Nazzal timely appealed.

**II.**

We review *de novo* whether restitution is permitted under the law, *United States v. Evers*, 669 F.3d 645, 654 (6th Cir. 2012), but we review forfeited arguments for plain error. *United States v. Coppenger*, 775 F.3d 799, 803 (6th Cir. 2015). "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" *United States v. Olano*, 507 U.S. 725, 733 (1993) (citation omitted). Nazzal did not waive his arguments that Z.C. and H.M. are not victims, as the government argues, but he did forfeit them.

After objecting to the PSR's characterization of Z.C. and H.M. as victims, Nazzal stated at the sentencing hearing that he was withdrawing all objections to the PSR "as part of a global agreement" with the government. He characterized this agreement as "resolv[ing] all of the issues that were pending before the Court." At the sentencing hearing, Nazzal did not object to the district court's decision to hold a restitution hearing, and he also did not object to Z.C. and H.M. being called victims and addressing the court as such. Later, in his response to the

government's supplemental sentencing memorandum, Nazzal did, however, object to the characterization of Z.C. and H.M. as victims, as he does on appeal. Thus, there is some ambiguity about the significance of Nazzal's statements about the agreement at the sentencing hearing and whether he waived or forfeited the argument about Z.C. and H.M.'s victim status.

The Seventh Circuit addressed an analogous factual situation in *United States v. Allen*, 529 F.3d 390 (7th Cir. 2008). In that case, the defendant filed a written objection to the restitution calculation in the PSR, but at sentencing, he did not restate his objection to the PSR calculation of the amount of loss. *Id.* at 392–94. The district court specifically asked whether there were still any objections to the PSR, and Allen responded that there were none, in light of the fact that the government had subtracted two offense levels for abuse of trust. *Id.* at 394. The Seventh Circuit noted that an objection not raised at sentencing is waived only if "the defendant had a strategic reason to forego the argument, that is, only if the defendant's counsel would not be deficient for failing to raise the objection." *Id.* at 395 (citation omitted). It accordingly held that the objection was forfeited, rather than waived, because there was no strategic reason to forgo at sentencing a challenge to the restitution figure. *Id.*

Given the lack of a written agreement with the government, the ambiguity about what PSR objections Nazzal's counsel intended to waive at the sentencing hearing, and the absence of a strategic reason to waive the argument that Z.C. and H.M. are not victims, we follow the Seventh Circuit's approach in *Allen* and apply plain-error review. "A plain error that affects substantial rights may be considered even though it was not brought to the court's attention." Fed. R. Crim. P. 52(b). To demonstrate plain error, an appellant must prove: (1) an error occurred in the district court; (2) the error was plain, i.e., obvious or clear; (3) the error affected the defendant's substantial rights; and (4) this adverse impact seriously affected the fairness,

integrity, or public reputation of the judicial proceedings. *Coppenger*, 775 F.3d at 803. The Supreme Court has directed that "[a]t a minimum, [a] court of appeals cannot correct an error pursuant to Rule 52(b) unless the error is clear under current law." *Olano*, 507 U.S. at 734.

**III.**

Because federal courts lack the inherent power to award restitution, we may order restitution "only when and to the extent authorized by statute." *Evers*, 669 F.3d at 655 (citation omitted). Victims of Title 18 offenses are eligible to receive restitution, 18 U.S.C. § 3663 (a)(1)(A), and a "victim" for the purpose of the statute is "a person directly and proximately harmed as a result of the commission of an offense . . . including . . . any person directly harmed by the defendant's criminal conduct in the course of [a] scheme, conspiracy, or pattern." *Id.* at § 3663(a)(2). The requirement that harm be "direct" means that "the harm to the victim [must] be closely related to the conduct inherent to the offense, rather than merely tangentially linked." *In re McNulty*, 597 F.3d 344, 352 (6th Cir. 2010).

In cases involving conspiracy, a court may "order restitution for damage resulting from any conduct that was part of the conspiracy and not just from specific conduct that met the overt act requirement of the conspiracy conviction." *United States v. Elson*, 577 F.3d 713, 723 (6th Cir. 2009) (citation omitted). Where a defendant is convicted via plea, "the court should look to the plea agreement, the plea colloquy, and other statements made by the parties to determine the scope of the 'offense of conviction' for purposes of restitution." *Id.* (citations omitted).

In *Elson*, we held that a defendant who pled guilty to conspiracy to obstruct justice could be ordered to pay restitution for losses resulting from a broader conspiracy to commit mail and wire fraud. *Id.* at 722, 725. In our reasoning, we looked to Elson's plea colloquy, which "included the entire course of Elson's fraudulent activity" and "reveal[ed] that the parties intended to include a broader range of acts in the offense of conviction than those related solely

to the conspiracy to obstruct the grand jury investigation." *Id.* at 723. We also pointed to Elson's plea agreement as establishing his agreement to pay restitution to victims of the broader conspiracy. *Id.* at 724.

In *In re McNulty*, however, we considered an analogous statute and held that McNulty was not a victim, because the harms he suffered were neither inherently criminal nor inherent in the crime of the conspiracy at issue, antitrust conspiracy. 597 F.3d at 351–52. The alleged harms to McNulty—being fired for refusing to participate in the conspiracy and being "blackballed" until he stopped assisting the government—were also not sufficiently related to the offense of conviction for McNulty to qualify as a victim. *Id.* at 352.

Here, Nazzal pled guilty to conspiracy to defraud the United States in violation of 18 U.S.C. § 371, so to be victims, Z.C. and H.M. must have been "directly and proximately harmed" by Nazzal's criminal conduct in the course of his conspiracy to defraud the United States, as the conspiracy was defined in his plea colloquy. 18 U.S.C. § 3663(a)(2); *Elson*, 577 F.3d at 723. In the plea colloquy, Nazzal admitted helping to arrange two fraudulent marriages that misled the Immigration and Naturalization Service. Nazzal specifically admitted assisting one of the cooks at his restaurants in arranging a false marriage to one of his waitresses, in the hope that the former "would become a good cook for [him]." He did not, however, admit the allegations of abuse that Z.C. and H.M. raised at the sentencing hearing, nor did he specifically admit arranging the fraudulent marriage that involved Z.C. and Mike Murry, though the government and the district court referred to this marriage indirectly.

The relatedness of the harms Z.C. and H.M. allege and the conspiracy would be a close question under *de novo* review, but under plain error review, the district court did not err in determining that the conspiracy directly and proximately caused the harm Z.C. and H.M.

sustained. Any error the district court made is not "clear under current law," as *Olano* requires. 507 U.S. at 734. H.M. testified that Nazzal kept their immigration papers and threatened to deport and otherwise harm them if they ever told anyone about his conduct, while Z.C. testified that Nazzal abused and threatened her after she married Murry, saying she owed him money and forcing her to work in his restaurant. Unlike the conduct at issue in *McNulty*, Nazzal's actions were clearly criminal, and it was not plain error for the district court to find that Nazzal's abuse of Z.C. and H.M. was part of his efforts to conceal the conspiracy.

## IV.

Nazzal next argues that the district court failed to consider Nazzal's negative net worth and cash flow in ordering restitution. We review a restitution order for abuse of discretion. *United States v. Blanchard*, 9 F.3d 22, 24–25 (6th Cir. 1993).

The district court did not abuse its discretion in determining that Nazzal was able to pay restitution to Z.C. and H.M. When the district court considers whether to order restitution, it must consider the amount of the loss sustained by each victim as a result of the offense, along with the defendant's financial resources, his financial needs and earning ability and those of his dependents, and "such other factors as the court deems appropriate." 18 U.S.C. § 3663(a)(1)(B)(i). The government bears the burden of establishing the amount of loss by a preponderance of the evidence, while the defendant bears the burden of proving his lack of financial resources and his financial needs. 18 U.S.C. § 3664(e); *United States v. Hart*, 70 F.3d 854, 863 (6th Cir. 1995); *Blanchard*, 9 F.3d at 25. Indigency does not bar an order of restitution, because a defendant's ability to pay is only one factor for the sentencing court to consider. *Blanchard*, 9 F.3d at 24–25. Even if a court finds that a defendant cannot pay a fine, the court may order restitution if it finds that the defendant is likely to earn future income. *United States v. Sanders*, 95 F.3d 449, 456 (6th Cir. 1996). We will infer that the sentencing court took the

appropriate factors into account regarding the defendant's financial situation when the statutory factors are discussed in the PSR. *See Blanchard*, 9 F.3d at 24–25.

Here, the PSR provides detailed information regarding Nazzal's financial resources, expenses, earning ability, and dependents. The district court's restitution order referred to the PSR, noting Nazzal's level of education, ownership of many businesses and properties, and family obligations. In determining that Nazzal would be able to make nominal restitution monthly payments, the court acknowledged his businesses' lack of equity but also cited his average future earning capacity. At the restitution hearing, Nazzal did not present any proof or make any objection to the imposition of restitution due to his inability to pay. In his response to the government's supplemental sentencing memorandum, he rejected the government's depiction of his current financial situation but provided no alternative. Based on these facts and given Nazzal's burden to prove his lack of financial resources, the district court did not abuse its discretion in ordering restitution in the amount of $79,107 to Z.C. and $222,399 to H.M.

**V.**

Nazzal also argues that the district court surprised and prejudiced him by not considering the report of psychologist Dr. Michael Abramsky and not granting a continuance until he was available to testify. Federal Rule of Criminal Procedure 32 and 18 U.S.C. § 3664 grant a district court discretion to choose the procedures for a restitution hearing "that will best aid the court in assessing the amount of loss." *United States v. Vandeberg*, 201 F.3d 805, 813–14 (6th Cir. 2000). Overall, these procedures must "afford[] the defendant a reasonable opportunity to respond," *Coppenger*, 775 F.3d at 804, and Rule 32 indicates "that a court must afford parties an opportunity to be heard on any disputed sentencing issue." *Vandeberg*, 201 F.3d at 814. A

suitable procedure "is one that precludes the possibility of prejudicial surprise." *Coppenger*, 775 F.3d at 804.

Here, the district court afforded Nazzal an adequate opportunity to be heard regarding potential restitution. Nazzal received the restitution requests regarding Z.C. and H.M., with supporting expert reports and affidavits, on January 7 and 8, 2014. He responded on January 23, 2014 without exhibits, expert reports, or notice that he intended to rely on an expert opinion. In his response, Nazzal did, however, challenge the methodology and credentials of the counselor whose report H.M. presented. At the restitution hearing on April 15, 2014, Nazzal cross-examined the counselor, again challenging her qualifications to diagnose mental illnesses and the basis of her diagnosis.

After the presentation by Z.C. and H.M., the district court asked Nazzal if he had anything to present, and he attempted to introduce a report from Dr. Abramsky. He also asked that Dr. Abramsky be allowed to testify at a later time. Z.C. and H.M. objected that they had only received his report the previous day—April 14—even though it was dated January 27 and that Dr. Abramsky was not present to be cross-examined. They also objected that based on their limited investigation, "perhaps this Court should not qualify [Dr. Abramsky] as an expert" because of a previous suspension based on misconduct and a then-pending complaint by the psychiatric board. Finally, Z.C. and H.M. objected on the grounds that allowing Nazzal additional time, after he had seen all of their information, was "substantially prejudicial." Nazzal countered that he was unaware there would be testimony at the restitution hearing. The district court declined to grant a continuance or to consider Dr. Abramsky's report, citing the two previous continuances, one at the request of Nazzal and one at the request of Z.C. and H.M.

Though perhaps it would have been preferable for the district court to consider Dr. Abramsky's report in tandem with Z.C. and H.M.'s objections to it instead of declining to consider the report altogether, the court's failure to do so did not prejudicially surprise Nazzal. He knew the basis of the restitution arguments, including the diagnosis of H.M. by a counselor, beginning in early January 2014. Nazzal did not mention Dr. Abramsky or his intention to rely on his opinion until the day before the twice-postponed restitution hearing, even though the report was prepared over two months prior to that date. Moreover, Nazzal made the same arguments he says Dr. Abramsky would have presented in his response to the government's supplemental sentencing memorandum, in his cross-examination of H.M.'s counselor, and in his presentation to the court. Given these facts, Nazzal received a reasonable opportunity to respond to the government's restitution case and was not prejudicially surprised.

## VI.

Finally, Nazzal argues that Z.C. was a co-conspirator and therefore was not entitled to restitution. He cites *United States v. Lazarenko*, 624 F.3d 1247 (9th Cir. 2010), in support of his argument. In *Lazarenko*, however, the Ninth Circuit distinguished the general rule that a participant in a crime cannot recover restitution from the special circumstances present in another case, *United States v. Sanga*, 967 F.2d 1332 (9th Cir. 1992). *Lazarenko*, 624 F.3d at 1252. *Sanga*'s analysis applies here as well. The Ninth Circuit noted:

> Our analysis [in *Sanga*] was informed by the fact that Quinlob [the victim/co-conspirator] was not named as a co-conspirator in the indictment; that she had a very minor role in the conspiracy; and that her persecution began *after the completion* of her small part of the conspiracy. Although she was technically a co-conspirator, her very small role was unconnected to the overall conspiracy; indeed, had she known the full extent of the conspiracy—that she would be forced to be a slave and rape victim—she would not have entered the conspiracy.

*Id.* Here, too, Z.C. was never named as a co-conspirator in a charging document, and she had a minor role in the conspiracy as a participant in a false marriage. Her persecution began after

Nazzal helped arrange her marriage, and had she known what was to come, she would never have participated. Thus, Z.C.'s role in the conspiracy does not preclude her from receiving restitution.

## VII.

For the foregoing reasons, we affirm the district court's restitution order.

ROGERS, Circuit Judge, concurring. I concur in the majority opinion, notwithstanding a concern that Nazzal's abuse of Z.C. and H.M.—however terrible—was not really part of Nazzal's efforts to conceal the conspiracy. The best way for Nazzal to conceal the conspiracy would have been to let the victims alone. Nazzal was apparently threatening to *reveal* the criminal acts constituting the conspiracy. Such threats are not inherent in the crime of the conspiracy, but instead are more in the nature of collateral blackmail. Such independent crimes should be prosecuted independently, or be brought under tort law. In the absence of sufficiently clear law to that effect, however, it is correct to uphold the restitution orders on plain error review.